IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

DIANNE SWEARENGEN,                )
                                  )
            Plaintiff,            )
                                  )
      v.                          )   Case No.
                                  )   07-6002-CV-SJ-REL-SSA
MICHAEL ASTRUE, Commissioner      )
of Social Security,               )
                                  )
            Defendant.            )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dianne Swearengen seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to give controlling weight to plaintiff's treating physician, and (2) failing to obtain a complete and up-to-date record of plaintiff's medical treatment. I find that the substantial evidence in the record as a whole supports the Administrative Law Judge's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.   BACKGROUND*

On June 4, 2004, plaintiff applied for a period of disability and disability insurance benefits alleging that she

had been disabled since January 1, 2004[1].  Plaintiff's disability

stems from back and leg problems.  Plaintiff's application was

denied.  On June 12, 2006, a hearing was held before an

Administrative Law Judge.  On July 7, 2006, the ALJ found that

plaintiff was not under a "disability" as defined in the Act.  On

November 14, 2006, the Appeals Council denied plaintiff's request

for review.  Therefore, the decision of the ALJ stands as the

final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for

judicial review of a "final decision" of the Commissioner.  The

standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by

substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,

402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,

850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th

Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.

1996).  The determination of whether the Commissioner's decision

is supported by substantial evidence requires review of the

entire record, considering the evidence in support of and in

opposition to the Commissioner's decision.  Universal Camera

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876

---

[1]Plaintiff originally alleged an onset date of April 1,
2002, but at the hearing amended the date to January 1, 2004, due
to substantial gainful activity in 2003 (Tr. at 34-35).

2

F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

Case 5:07-cv-06002-REL   Document 29   Filed 08/11/08   Page 3 of 44

type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

                 Yes = not disabled.
                 No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

                 No = not disabled.
                 Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

                 Yes = disabled.
                 No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

                 No = not disabled.
                 Yes =  go to next step where burden shifts to Commissioner.

4

5.    Does the impairment prevent the claimant from doing any
other work?

                    Yes = disabled.
                    No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and

vocational expert Barbara Myers, in addition to documentary

evidence admitted at the hearing.

## A.    *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following

income from 1974 through 2005:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $     512.04 | 1990 | $ 5,194.28 |
| 1975 | 3,684.22 | 1991 | 4,357.59 |
| 1976 | 4,803.26 | 1992 | 4,283.50 |
| 1977 | 6,985.96 | 1993 | 3,400.00 |
| 1978 | 8,555.04 | 1994 | 10,238.21 |
| 1979 | 9,864.86 | 1995 | 13,375.28 |
| 1980 | 11,374.95 | 1996 | 12,945.32 |
| 1981 | 13,073.61 | 1997 | 12,632.78 |
| 1982 | 14,977.25 | 1998 | 14,145.09 |
| 1983 | 16,378.21 | 1999 | 18,499.49 |
| 1984 | 17,136.93 | 2000 | 19,886.72 |
| 1985 | 17,485.34 | 2001 | 22,301.95 |
| 1986 | 19,171.33 | 2002 | 19,652.50 |

5

| 1987 | 19,753.10 | 2003 | 9,916.52 |
|------|-----------|------|----------|
| 1988 | 19,965.52 | 2004 | 7,353.56 |
| 1989 | 5,086.77 | 2005 | 7,708.18 |

(Tr. at 135, 136).

**Disability Report**

In a Disability Report dated August 9, 2003, plaintiff was asked how her condition limits her ability to work (Tr. at 148). She wrote, "I can no longer work a 10 hour shift. I can't do the work required." (Tr. at 148).

**Pain Questionnaire**

In a Pain Questionnaire dated August 27, 2003, plaintiff was asked what she does to relieve her pain (Tr. at 164). She wrote, "pain pills, bearable after taking pain pills" (Tr. at 164).

**Administrative Report**

In an untitled administrative report dated August 27, 2003, plaintiff reported that she is able to do laundry, do dishes, make beds and change sheets with help, vacuum, sweep, take out small bags of trash, and run errands like going to the bank or post office (Tr. at 167). When asked what she does on an average day, plaintiff wrote that she reads, does personal care, and takes care of her business (Tr. at 168). Most of her day is spent doing house work (Tr. at 168). She reported that she has a valid drivers license and drives seven miles into town (Tr. at 168).

6

**Case Action Notes**

On November 12, 2003, plaintiff told a Disability Determinations employee that she is able to sit for two hours at a time and then must get up for about ten to 15 minutes before sitting back down (Tr. at 179).

**B.    *SUMMARY OF MEDICAL RECORDS***

On July 18, 2002, plaintiff saw Dale Essmyer, D.O., a family practitioner, for back pain (Tr. at 270). "She was doing some lifting and strained herself. . . .  I'm going to hold her Lorcet for now and give her some Tylox.  I think she needs something stronger than what the Lorcet is doing for her."  Dr. Essmyer prescribed Tylox [narcotic], one or two three times a day, 30 pills.

On July 24, 2002, plaintiff saw Dr. Essmyer for low back pain (Tr. at 270).  Dr. Essmyer refilled plaintiff's Tylox [narcotic] and told her to get an appointment with the Pain Clinic as soon as possible.

On July 30, 2002, plaintiff had a lumbar epidural steroid injection done by Nathan Berry, D.O. (Tr. at 217-221).  Dr. Berry noted that plaintiff was smoking 1 1/2 to 2 packs of cigarettes per day.  Her current medications included Tylox [narcotic], Soma [muscle relaxer], and Hydrocodone [narcotic]. She had positive straight leg raising at 15 degrees on the left.  Dr. Berry assessed low back pain with left radiculopathy and tobacco abuse.

7

Plaintiff was told to rest and do no heavy lifting for the next day or so.

On August 9, 2002, plaintiff saw Dr. Essmyer for ongoing neck and back discomfort (Tr. at 269).  "She has had some improvement of her radiculopathy following epidural steroid injection."  Dr. Essmyer refilled plaintiff's Tylox [narcotic] (30 pills).

On August 27, 2002, plaintiff saw Dr. Essmyer for a recheck on her back (Tr. at 267, 269).  "I'm going to refill her Tylox [narcotic] and Soma [muscle relaxer].  The patient still needs an MRI to delineate the anatomy of her low back and spinal column.  We'll continue physical therapy for now."  He refilled her Tylox [narcotic] (90 pills).

On September 13, 2002, Dr. Essmyer refilled plaintiff's Tylox [narcotic] (30 pills) (Tr. at 267).

On September 21, 2002, Dr. Essmyer refilled plaintiff's Tylox [narcotic] (120 pills) (Tr. at 267).

On September 25, 2002, plaintiff saw Dr. Essmyer requesting a refill of her Tylox [narcotic] (Tr. at 267).  "The patient is seen for recheck following neurosurgical consultation.  They have recommended leaving her herniated disc alone and allowing it to heal on its own. At their recommendation, we will continue narcotic pain control in as a controlled response as possible. We

8

will also continue her anti-inflammatory and simply allow the
situation to heal as best it can."

On November 8, 2002, Dr. Essmyer refilled plaintiff's Tylox
[narcotic] (120 pills) (Tr. at 267).

On November 27, 2002, Dr. Essmyer refilled plaintiff's Tylox
[narcotic] (60 pills) (Tr. at 267).

On January 3, 2003, plaintiff saw Dr. Essmyer for a recheck
on her back pain (Tr. at 268). "The patient has been seen by
orthopedics and the recommendation was made to allow this more
time to continue to heal, but she continues to have rather
significant pain and ongoing requirement for Tylox at least one
twice a day. In the recommendations of the orthopedist, it was
mentioned that she should recheck with the Pain Clinic for
further treatment from them. She has not mentioned this to me
earlier. I strongly recommended that she proceed down this
path." Dr. Essmyer refilled plaintiff's Tylox [narcotic] (120
pills with a note that this should be a two-month supply) (Tr. at
268).

On January 20, 2003, plaintiff had an MRI of her lumbar
spine (Tr. at 216). Plaintiff had slight anterolisthesis of L4
on L5 and prominent hypertrophic changes of the facets with a
circumferential disc bulge resulting in severe central bilateral
lateral recess and bilateral inferior neural foraminal stenosis.

9

On January 24, 2003, plaintiff saw Dr. Essmyer for a recheck following her lumbar spine MRI (Tr. at 268). "She has rather dramatic disease. . . . With this level of disease, I believe surgical approach is almost a certainty. She continues to have severe radicular back pain, requiring large amounts of narcotic pain control." Dr. Essmyer refilled plaintiff's Tylox [narcotic] (120 pills).

On February 3, 2003, plaintiff saw Gregory Brandenberg, M.D., Ph.D., a neurosurgeon (Tr. at 233-234).

Her pain increases with standing and lifting and she does not notice anything in particular that decreases that pain. The pain began back in 2002, but [she] does not recall any particular event that brought it on. She has had ongoing problems with it since. . . .

PRESENT MEDICATIONS: Tylox [narcotic] and Flexeril [muscle relaxer].

SOCIAL HISTORY: . . . She smokes 2 packs of cigarettes per day.

* * * * *

PHYSICAL EXAMINATION:

GENERAL: Reveals a well-developed female who does not appear to be in significant discomfort or distress at the time of this examination.

GAIT and STANCE: Her gait is normal. She arises from a chair to a standing position without difficulty.

MUSCULOSKELETAL:

Spine: There is diffuse tenderness to palpation over the lumbosacral region. No specific sacroiliac or trochanteric tenderness is appreciated. Lumbar range of motion is limited at the extremes in all planes.

10

Extremities:  Straight leg raising sign is (-).
Strength is 5/5 throughout.  Deep tendon reflexes
are 0/4 at the knees, 1/4 at the right ankle and
0/4 at the left ankle.  No pathological reflexes
are identified.

OBJECTIVE STUDIES:  I reviewed an MRI scan of the
lumbar spine obtained at Kirksville on January 20,
2003.  This reveals some disk space narrowing and
desiccation at L4-5, L5-S1 with a slight listhesis at
L4-5.  She also has some mild degenerative changes at
L3-4.  At L4-5 she has facet hypertrophy causing
bilateral recess narrowing.

IMPRESSION:  Chronic lumbar spondylotic pain with
intermittent radicular symptoms.

PLAN/RECOMMENDATIONS:  I discussed the MRI findings with the
patient and explained that her back pain is mostly related
to her spondylosis and that she has intermittent leg
symptoms most likely from lateral recess stenosis.  She has
not worked with physical therapy to date and I am
recommending that we proceed with that for lumbar
stabilization and modalities.  I also will arrange for her
to receive epidural steroid injections.  I also discussed
with her the importance of smoking cessation, first for
general back health and secondly for the fact that if she
requires any type of surgery in the future that might
require fusion that she would need to be smoke free before
that could become an option.

She also asked me questions about disability and I told her
I was not a disability evaluator and could not answer those
questions for her.  I did tell her we could refer her to a
physiatrist if she is interested in that.  She does not want
to return to work at this time, stating she was hurting too
much, so I did give her a release from work for the next 4
weeks while she is undergoing this initial treatment course
and until I see her back in my office.  If in that 4-week
period she continues with the same pain, and if she
continues to smoke, then I think referral to a pain clinic
would be beneficial for her.

On February 10, 2003, Dr. Essmyer refilled plaintiff's Tylox

[narcotic] (120 pills) (Tr. at 268).

11

On February 18, 2003, plaintiff was seen by Nathan Berry, D.O., at Northeast Regional Medical Center for her second lumbar epidural steroid injection (Tr. at 213-214). Plaintiff told Dr. Berry that she only got two days of relief from her first injection, "[h]owever, she still remains in better physical condition. She is able to walk better and do her daily activities better than she was back then. . . . She has a positive straight leg raising on the left, but it is not nearly as exquisitely tender upon range of motion as well as straight leg raising." Dr. Berry diagnosed low back pain with lower extremity radiculopathy and tobacco use.

On February 27, 2003, plaintiff saw Dr. Essmyer for a refill on medications (Tr. at 265). "The patient has been using about eight Tylox a day to control her chronic radicular back pain. We've had her seen by both neurosurgery and the Pain Clinic. The Pain Clinic was of minimal help and she continues to treat her pain chronically since this seems as if it's going to be a long term problem, I've recommended that we switch her to a more long term, chronic pain medication. . . . At this point she demonstrates no slurred speech although she is rather anxious, this seem[s] to be mostly chronic. She's otherwise stable." Dr. Essmyer prescribed OxyContin [narcotic] twice a day (60 pills).

On March 6, 2003, plaintiff called Dr. Essmyer's office (Tr. at 265). He told her she could increase her OxyContin to three

times a day instead of twice a day.

On March 10, 2003, Dr. Essmyer prescribed OxyContin [narcotic] three times per day (90 pills).

On March 13, 2003, plaintiff saw Dr. Essmyer "to discuss medications" (Tr. at 265-266). "She doesn't seem to feel that the Oxycontin is being very helpful. I discussed with her that I really do not feel comfortable putting her on short acting pain medication for a chronic pain disorder. She's alert, in no obvious distress. Speech is not slurred. She walks without difficulty." Dr. Essmyer wrote a prescription for Norco [narcotic] (80 pills).

On March 14, 2003, plaintiff called Dr. Brandenberg's office to cancel her appointment "again" and did not request to reschedule (Tr. at 232).

On April 2, 2003, plaintiff saw Dr. Essmyer for a recheck on her chronic pain (Tr. at 264). He recommended that she proceed with further rheumatologic work up. "We will continue her OxyContin [narcotic] at 40 mg[2] one po [by mouth] tid [three times per day] and the Norco [narcotic] for breakthrough pain. . . . I've discussed the use of chronic pain medications with her once again and how they should be used extremely with great care especially in a situation like hers where we are unlikely to find

_____

[2]This was an increase from her previous dose which was 20 mg three times per day.

13

a significant route in which to cure her condition.  We will
continue to provide supportive care as long as she continues to
be very careful with her narcotics usage."

On April 30, 2003, plaintiff saw Dr. Essmyer for a recheck
(Tr. at 264).  "Patient continues to run out of medication early
and manipulate her own medications.  I've discussed this with
her.  We will go ahead and have her sign a Pain Clinic Contract
today and I have, once again, instructed her that there will not
be any exceptions as per the terms of the pain agreement.  I will
not increase her pain medication without discussing it with her.
We will have to follow her on a monthly basis".  Dr. Essmyer
wrote a prescription for OxyContin [narcotic] (90 pills) "to last
until 6-2-03" and Norco [narcotic] (60 pills).

On June 2, 2003, plaintiff saw Dr. Essmyer complaining of
back pain (Tr. at 263).  "In general her medicine is controlling
her. . . .  We'll refill her medications and continue to monitor
her."  He wrote a prescription for OxyContin [narcotic] (90
pills) and Norco [narcotic] (60 pills).

On June 30, 2003, plaintiff saw Dr. Essmyer stating the
"pain is bad.  Need refill." (Tr. at 263).  "We've had her seen
by spinal surgeon who had wanted us to do a number of things
before he would consider surgery, although the patient does
continue to smoke, she has undergone physical therapy with
minimal results and has had several epidural steroids injections

14

also with minimal to no long term relief. The patient is getting more and more depressed. She is becoming more dependent on narcotics. . . . At this point I strongly believe that if a surgical option is not available to her, then we will simply have to continue to control her pain as best we can and deal with the problems associated with this long term disorder. We are going to begin therapy for depression and continue her current pain control in the form of OxyContin and more fasting [sic] acting Hydrocodone and get her to see back surgeon again for one last visit." Dr. Essmyer wrote a prescription for OxyContin [narcotic] (90 pills) and Norco [narcotic] (60 pills).

On July 24, 2003, plaintiff saw Gregory Brandenberg, M.D., Ph.D., for chronic lumbar pain (Tr. at 231). Plaintiff had reported little benefit from the three epidural steroid injections and physical therapy. Plaintiff was taking OxyContin and Hydrocodone, both narcotic pain relievers. Dr. Brandenberg performed a physical exam and found that plaintiff's gait was normal, she was able to raise from a chair to standing position without difficulty, straight leg raising was negative, strength in her lower extremities was 5/5. Dr. Brandenberg reviewed plaintiff's January MRI scan which revealed some spondylosis at L4-5 and L5-S1. He recommended a CT myelogram of her lumbar spine to see if there was any evidence of root compression which could possibly be relieved. "She does have spondylosis, which I

15

told her was causing her back pain, and I don't feel that I would intervene surgically just for back pain.  Once again, she asked me about disability and I told her I was not a disability evaluator, and if she had questions she needed to discuss that with an occupation medicine specialist.  She states that she will get in touch with me if she decided to proceed with the CT myelogram."

On July 30, 2003, Dr. Essmyer prescribed OxyContin [narcotic] (90 pills) and Norco [narcotic] (60 pills) (Tr. at 262).

On August 5, 2003, plaintiff called Dr. Brandenberg's office to schedule a CT-myelogram of her lumbar spine (Tr. at 230).  The procedure was scheduled for August 12, 2003.

On August 11, 2003, plaintiff called to cancel the CT myelogram scheduled at Boone Hospital Center the next day (Tr. at 229).  "She is not interested in rescheduling at this time until she gets some personal matters under control."

On August 28, 2003, plaintiff saw Dr. Essmyer for refills on medications (Tr. at 260).  "The patient continues to take medication for chronic, ongoing low back pain. She also has right arm paresthesias[3].  A CT myelogram had been recommended by Dr.

---

[3]An abnormal sensation such as burning, pricking, tickling, or tingling.

Brandenburg in the past and this has never been done, so we are going to go ahead and set that up."

On September 27, 2003, Dr. Essmyer prescribed OxyContin [narcotic] (90 pills) and Norco [narcotic] (60 pills) (Tr. at 260).

On October 1, 2003, plaintiff had a "school bus physical" performed by Dr. Essmyer (Tr. at 260-261). He wrote, "I see no reason why she shouldn't be able to drive the bus."

On October 27, 2003, plaintiff saw Dr. Essmyer for refills and complained of back spasms from coughing (Tr. at 261). "She's taken a few extra Oxycontin in an effort to try and keep her pain under control." Dr. Essmyer prescribed OxyContin [narcotic] (90 pills) and Norco [narcotic] (60 pills).

On December 22, 2003, plaintiff saw Dr. Essmyer to a refill on medications (Tr. at 259). He prescribed OxyContin [narcotic] (90 pills), and Norco [narcotic] (60 pills).

January 1, 2004, is plaintiff's alleged onset date of disability.

On January 23, 2004, plaintiff saw Dr. Essmyer for a check up on her back (Tr. at 259). "She would like her pain meds renewed. We also talked about her trying to get disability. When she tried to get disability, she had no one to help her. When she made the application, she has no one to state she was disabled. I don't think she took a very organized approach and

17

I'm not the least bit surprised that she was denied. We talked
again about how one has to go about making and [sic] organized
approach to disability so they have something to justify the
disability with and she'll reevaluate and let us know if we can
help her in any way." Dr. Essmyer prescribed OxyContin
[narcotic] (90 pills) and Norco [narcotic] (60 pills).

On February 23, 2004, plaintiff saw Dr. Essmyer for a refill
on medications (Tr. at 258-259). "She of course suffers from
chronic pain related to her herniated discs of the back. She
also has spinal degenerative change which is contributing to her
chronic pain." Dr. Essmyer prescribed OxyContin [narcotic].

On March 22, 2004, plaintiff saw Dr. Essmyer who observed a
little bit of fluid in the olecranon bursa on the right elbow
(Tr. at 258). He set her up with a specialist to have that
evaluated, and he prescribed OxyContin [narcotic] (60 pills) and
Norco [narcotic] (60 pills).

On March 29, 2004, plaintiff saw Dr. Essmyer who drained and
injected her olecrano bursitis (Tr. at 256).

On April 1, 2004, plaintiff[4] saw Glenn Browning, D.O., due
to pain and numbness in her right hand with occasional swelling
(Tr. at 241). She had fluid removed from her right elbow a few
days earlier by Dr. Essmyer. Plaintiff reported no new health

---

[4]Plaintiff was 46 years old at the time, but this medical
record refers to her as being 52 years old.

changes since her last exam on July 13, 2000. "She presently takes Oxycontin and Hydrocodone. She has been trying to get disability because of problems with her back, etc." Plaintiff had symptoms of carpal tunnel syndrom. He told her to come back in two weeks. "I feel that she will require surgical intervention but we will wait to see how her elbow comes along or if she needs an excision of the bursa we could do that at the same time."

On April 4, 2004, Plaintiff saw Dr. Essmyer for refills on her medications (Tr. at 256). He prescribed Narco [narcotic] (60 pills) and OxyContin [narcotic] (60 pills).

Also on April 22, 2004, plaintiff saw Dr. Browning for a recheck of her right elbow (Tr. at 240). "Her right elbow is looking quite good and the bursitis has subsided however she is still having problems with the right hand. . . . Surgical intervention is recommended and will be set up at her convenience."

On April 30, 2004, plaintiff saw Dr. Essmyer to have sutures removed from the removal of a lesion on her thigh (Tr. at 257).

On May 6, 2004, plaintiff saw Dr. Browning for a recheck of her right hand (Tr. at 230). "She has excellent sensation and no pain. She is feeling great at this time." He told her to come back in a week for suture removal.

On May 13, 2004, plaintiff saw Dr. Browning for a recheck of her right hand (Tr. at 238). The sutures were removed. "She is doing very well and having only mild discomfort." Dr. Browning noted that plaintiff was be rechecked on an as-needed basis.

On May 19, 2004, plaintiff saw Dr. Essmyer (Tr. at 257). "She just seems to ache and hurt all over. . . . I question whether she may have the fibromyalgia. Orthopedics, Dr. Browning, suspicions [sic] this as well. She has multiple tender points on her back, through her spine and paraspinal area and on her extremities, the lateral aspects of her legs and forelegs." Dr. Essmyer prescribed OxyContin [narcotic] (60 bills) and Norco [narcotic] (30 pills) and made arrangements for plaintiff to see a rheumatologist.

On June 1, 2004, plaintiff saw Robert Jackson, D.O., a rheumatologist (Tr. at 243-244).

> Mrs. Swearengen was seen for diffuse arthralgias and myalgias[5] with a history of probably fibromyalgia syndrome for the last several years. . . . She is a chronic smoker and has little if any physical activity. She has been on chronic narcotic therapy to control her generalized pain complaints which include both Oxycontin and Hydrocodone alternative medications. . . .
>
> PHYSICAL EXAM: . . . MS [musculoskeletal] exam revealed some subtle Heberden's and Bouchard's nodes[6] consistent with

---

[5]Diffuse arthralgias and myalgias are pains in joints (not inflammatory in character) and muscles that are spread throughout the body.

[6]Cartilage-capped bony projections on the first and second joints of each finger.

20

primary osteoarthritis.  She had diffuse prominent
fibromyalgia tender points over the elbows, shoulders, low
back, hips and knees. . . .  She has mild right elbow
olecranon bursitis[7] with associated mild palpatory
tenderness.

IMPRESSION:
1.   Primary osteoarthritis and lumbar degenerative facet
     spondylosis.
2.   Diffuse fibromyalgia.
3.   Mild right elbow olecranon bursitis.

PLAN:
1.   Consider right elbow olecranon bursectomy per Dr. Glenn
     Browning if symptoms persist.
2.   Start calcium supplementation . . .
3.   Start Mag-Ox [magnesium supplement] . . .
4.   Consider starting Flexeril or Skelaxin [muscle
     relaxers] for nocturnal pain relief as treatment for
     fibromyalgia.
5.   Continue periodic LESI [lumbar epidural steroid
     injection] injections per anesthesiology department as
     allotted.  The patient can have approximately 3
     injections every 12 months.
6.   A walking exercise program of at least 30 minutes
     daily.
7.   Annual rheumatology follow-up thereafter.

On June 15, 2004, plaintiff saw Dr. Essmyer for refills (Tr.

at 254).  He assessed fibromyalgia, based on the report of Dr.

Jackson, and prescribed Flexeril [muscle relaxer], OxyContin

[narcotic] (60 pills), and Norco [narcotic] (60 pills) (Tr. at

254).

---

[7]Elbow bursitis, also called olecranon bursitis, causes
fluid to collect in a sac that lies behind the elbow, called the
olecranon bursa. A bursa is a slippery, sac-like tissue that
normally allows smooth movement around bony prominences, such as
the point behind the elbow. When a bursa becomes inflamed, the
sac fills with fluid. This can cause pain and a noticeable
swelling behind the elbow.

Case 5:07-cv-06002-REL   Document 29   Filed 08/11/08   Page 21 of 44

On June 22, 2004, plaintiff saw Dr. Essmyer for a follow up, and complained of back and leg pain (Tr. at 255). "Her bursa continues to bother her. We need to try to get her pain under control. . . . She is set up to see Dr. Browning as far as the olecranon bursa is concerned. In general she's having pain in her back, her leg and her hips and just aching all over. . . . We will give her the Depo Medrol [steroid] 80 mg and Decadron [steroid] 4 mg injection to see if we can calm that down."

On June 29, 2004, plaintiff saw Dr. Browning for an evaluation of her right elbow (Tr. at 237). Dr. Browning noted that plaintiff previously had olecranon bursitis and had the bursa drained. Plaintiff's elbow remained tender but the bursa was not enlarged. "We will give her another six weeks to see if this won't resolve and if not we may have to remove the bursa."

On July 12, 2004, plaintiff saw Dr. Essmyer for a check up (Tr. at 253). He prescribed OxyContin [narcotic] (60 pills) and Narco [narcotic] (60 pills).

On August 20, 2004, Janet Elliot, a medical consultant, completed a Physical Residual Functional Capacity Assessment (Tr. at 272-279). Dr. Elliot found that plaintiff could lift ten pounds, stand or walk at least two hours per day, sit for about six hours per day, must periodically alternate sitting and standing, and had an unlimited ability to push or pull. In support of these findings, Dr. Elliot noted that plaintiff's

22

doctor "is prescribing a variety of narcotic medications to try to control her symptoms. He lists her symptoms as severe pain but qualifies her to drive a school bus under DOT rules: impairment cannot interfere with her ability to operate a motor vehicle safely see DOT physical requirements 391.41. So it must [be] assumed that she tolerates her medications and allows her to function. . . . She has been advised to have a myelogram by Dr. Brandenberg see not 7-24-03 but did not follow through. She has been advised that no surgical intervention can be pursued if she continues to smoke but also continues to do so."

Dr. Elliot found that plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but that she should never climb ladders, ropes or scaffolds. She found that plaintiff had no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. In conclusion, Dr. Elliot wrote, "[N]o significant change in physical exam or symptoms since 2002. Her ability to pass a school bus driver physical requirement exam during that period indicates her ability to function. The requirements for that DOT position are stringent and do not limit time to perform these functions. Her physical exam reveals no pathologic reflexes and no motor strength deficits or severe impairments likely to interfere with her ability to perform SGA [substantial gainful activity]."

23

On February 21, 2005, plaintiff had an MRI of her lumbar spine (Tr. at 280). Dr. Godbee's impression was:

1.    L4-5 moderate-to-severe central canal and moderate bilateral facet stenosis secondary to degenerative disease.

2.    3 mm anterolisthesis of L4-5 from degenerative disease and possibly incomplete stress fracture of the right pars interparticularis.

On November 8, 2005, Dr. Essmyer sent a letter to Dena Shoop, Caseworker, Department of Health and Senior Services (Tr. at 281-282). Dr. Essmyer's letter reads in part as follows:

. . . Her MRI on 1/20/03 revealed L4-L5 mild anterolisthesis. There are prominent hypertrophic changes of the facets with circumferential disc bulge. This results in **severe** central, bilateral inferior neural recess and bilateral inferior neural foraminal stenosis. At L3-L4 there is a mild broadbased posterior disc bulge with mild hypertrophic changes of the facets resulting in mild central and bilateral recess stenosis. She is also followed by Dr. Robert Jackson, a Rheumatologist in Kirksville, MO.

She has had the maximum LESI's [lumbar epidural steroid injection] in her lower back that she can have in a year. She is on chronic narcotic therapy to control her generalized pain complaints which includes both Oxycontin and Hydrocodone. She suffers from primary osteroarthritis and lumbar degenerative facet spondylosis, diffuse fibromyalgia, and chronic pain. I do give her osteopathic manipulative therapy treatments as she can tolerate and this does seem to help.

Ms. Swearengen is unable to hold a full time job due to the chronic pain from her listed diagnoses. Please allow her to continue with Medicaid coverage. No coverage would mean that she could not afford the pain medications and/or therapy that she gets periodically.

(Tr. at 281-282) (emphasis in the original).

24

*C.*    *SUMMARY OF TESTIMONY*

During the June 12, 2006, hearing, plaintiff testified; and Barbara Myers, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 48 years of age and is currently 50 (Tr. at 26). She is a high school graduate without any additional vocational training (Tr. at 26-27). Plaintiff was 5'6" tall and weighed 119 pounds (Tr. at 27).

Prior to her alleged onset date, plaintiff worked full time at Airco, a convenience store (Tr. at 35). She was an assistant manager (Tr. at 35). Plaintiff's duties included putting 15 to 16 cases of beer on a dolly and pushing it (Tr. at 35). She guessed that each case weighed 50 to 60 pounds (Tr. at 35-36). Plaintiff worked the cash register, did the books, went to the bank (Tr. at 36). She performed that job for 11 years (Tr. at 36). During 2003 plaintiff missed 13 weeks of work because she could not walk (Tr. at 70). No one could tell her why she could not walk, she just couldn't (Tr. at 70). Instead she crawled (Tr. at 70). Plaintiff also worked as a school bus driver for eight years (Tr. at 38). During the previous two years, plaintiff missed about 20 days of work as a bus driver due to her back (Tr. at 71).

25

At the time of the hearing, plaintiff was driving a school bus for about two hours per day earning $835 per month (Tr. at 49). After driving the bus for an hour, resting for seven hours, and then driving the bus for another hour each day, plaintiff is in pain (Tr. at 62). Plaintiff only drives the bus because she cannot find any other work (Tr. at 63). She makes enough money driving the bus to keep her home (Tr. at 63).

Plaintiff injured her back at Airco in 2003 (Tr. at 41). She does not know how she injured her back and did not file a worker's compensation claim (Tr. at 41). Plaintiff has had three epidural shots, the last one about two years before the hearing (Tr. at 41-42). She stated that she got no relief from the shots (Tr. at 42). All three shots were in one year, and her doctor said three is all you can get in a year (Tr. at 68). Plaintiff participated in physical therapy for about a month (Tr. at 42). At the time of the hearing, plaintiff was taking OxyContin, a drug she started taking in 2004 (Tr. at 43). Plaintiff has had no other treatment for her back (Tr. at 44).

Plaintiff was diagnosed with fibromyalgia, but she does not remember when and does not know how many trigger points she has (Tr. at 44-45). Plaintiff's left thumb hurts and her hands swell considerably every morning (Tr. at 47). Plaintiff's alarm goes off at 4:30 a.m., and her hands remain swollen until about 7:00 a.m. (Tr. at 48). She rubs them and runs hot water over them

26

(Tr. at 48). Her hands swell again from about 3:30 to 5:00 p.m.
after she finishes her job driving a bus (Tr. at 49). Plaintiff
had been taking Hydrocodone for the past year for her
fibromyalgia (Tr. at 45). Plaintiff has no side effects from any
of her medication (Tr. at 46).

Plaintiff's pain radiates into her legs and she can only
walk about 220 yards as a result (Tr. at 47, 57). She can sit to
drive for about two hours at a time (Tr. at 52). Plaintiff rode
the two and a half hours to the hearing with her attorney, and
plaintiff had to stop three times during the trip to get out and
stretch (Tr. at 69). She believes she could lift ten pounds
sometimes but not repetitively, and could not ever lift 15 pounds
(Tr. at 58). Plaintiff only gets five to six hours of sleep per
night because of her pain (Tr. at 52).

Plaintiff is single and lives alone in a mobile home (Tr. at
51). She does her own cooking and cleaning (Tr. at 51).
Plaintiff does not drink but she smokes one pack of cigarettes
per day (Tr. at 51-52). She goes to church about once a month
and is able to sit through the sermon which is an hour and 15
minutes long (Tr. at 55). She goes out to eat occasionally (Tr.
at 55). Plaintiff does not read but she watches television and
listens to music (Tr. at 55-56).

The ALJ asked plaintiff whether she could perform a job
where she could sit or stand whenever she wanted to but had to do

something like keep an eye on a monitor (Tr. at 56). Plaintiff said she would need to sit for a half hour and then stand for a half hour (Tr. at 56). Later her attorney asked her if she would really be able to do such a job, and she said she did not think so (Tr. at 64).

## 2. Vocational expert testimony.

Vocational expert Barbara Myers testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could perform the full range of sedentary work with a sit/stand option at will; only occasional bending; no overhead lifting or reaching; no lifting from the floor; only lifting from table level; and may occasionally crawl, crouch, kneel, or squat (Tr. at 78). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 78). However, the person could work as a credit authorizer, D.O.T. 237-367.014, with approximately 175 jobs in Missouri and 8,000 in the country; an information clerk, D.O.T. 237-367.046, with approximately 1,300 in Missouri and 70,000 in the country; or a food and beverage order clerk, D.O.T. 209-567.014, with approximately 350 in Missouri and 15,000 in the country (Tr. at 78-80).

The next hypothetical involved a person with the same limitations as those in the first hypothetical but who would miss 13 days of work per year due to back pain (Tr. at 80-81). The

28

vocational expert testified that such a person could not perform the jobs listed in hypothetical one because of too many absences (Tr. at 81).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge William Horne entered his opinion on July 7, 2006, finding plaintiff not disabled (Tr. at 14-22).

Step one.  Plaintiff has worked since her alleged onset date, but it does not rise to the level of substantial gainful activity (Tr. at 15).

Step two.  Plaintiff suffers from degenerative disc disease of the lumbar spine at the L4-5 disc level, fibromyalgia, and history of right carpal tunnel release surgery in 2004, which are severe impairments (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff retains the residual functional capacity to perform sedentary work with a sit/stand option at will; to occasionally bend, crawl, squat, crouch, or kneel; should do no overhead reaching or lifting; and should do no lifting from the floor (table level only) (Tr. at 19-20).  With this residual functional capacity, plaintiff cannot return to her past relevant work (Tr. at 20).

Step five.  Plaintiff is capable of performing sedentary jobs with a sit/stand option such as credit authorizer, with 175

29

jobs in Missouri and 8,000 jobs in the country; information
clerk, with 1,300 jobs in Missouri and 70,000 jobs in the
country; and food and beverage order clerk, with 350 jobs in
Missouri and 15,000 in the country (Tr. at 20).

The ALJ pointed out that Section 223(d)(2)(A) of the Act
states that a person cannot be found disabled because work the
person can perform does not exist in the immediate are where the
person lives, or because a specific job vacancy does not exist,
or because the person would not be hired if she applied for a job
she is capable of performing (Tr. at 20).

## VI.  *OPINION OF PLAINTIFF'S TREATING PHYSICIAN*

Plaintiff first argues that the ALJ erred in failing to give
controlling weight to the opinion of Dr. Essmyer who wrote on
November 8, 2005:

> [Plaintiff] is unable to hold a full time job due to the
> chronic pain from her listed diagnoses.  Please allow her to
> continue with Medicaid coverage.  No coverage would mean
> that she could not afford the pain medications and/or
> therapy that she gets periodically.

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005);
Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ
fails to give controlling weight to the opinion of the treating

physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

**1. Length of treatment relationship.** The records of plaintiff's visits to Dr. Essmyer span from July 18, 2002, through July 12, 2004.

**2. Frequency of examinations.** This factor is a bit more complicated than it first appears. The records show that plaintiff saw Dr. Essmyer approximately 35 times during the two-year period noted above. However, Dr. Essmyer's records do not reflect that he EVER examined plaintiff. There is not one mention of an examination or any tests in Dr. Essmyer's records. The most detailed medical record of Dr. Essmyer mentions "multiple tender points", but does not even state how many. And his diagnosis of fibromyalgia was admittedly based on another doctor's assessment.

Although the ALJ was to consider frequency of examinations, there do not appear to be any examinations by Dr. Essmyer, just many many refills of narcotic prescriptions.

31

**3. Nature and extent of treatment relationship.** Plaintiff saw Dr. Essmyer for treatment of her back pain, for which he prescribed narcotics.

**4. Supportability by medical signs and laboratory findings.** As mentioned above, Dr. Essmyer's records do not reflect the performance of any tests or any laboratory findings, and it appears that his treatment may have been based on less-than-truthful allegations by plaintiff. A careful reading of the medical records suggests that plaintiff was not accurately reporting to Dr. Essmyer her visits and treatment with other doctors. For example, on August 27, 2002, Dr. Essmyer wrote, "We'll continue physical therapy for now." However, on February 3, 2003, about five months later, plaintiff told a neurosurgeon that "she has not worked with physical therapy to date". In addition, there are no physical therapy records in the administrative file. On January 3, 2003, Dr. Essmyer commented that plaintiff had failed to tell him that the orthopedist recommended that plaintiff go to a pain clinic. On May 19, 2004, Dr. Essmyer suspected that plaintiff had fibromyalgia, and then noted that Dr. Browning, the orthopedist, had the same suspicions. However, a review of Dr. Browning's records at that time shows that he saw plaintiff on April 1, 2004, for her hand and noted that plaintiff reported no new health changes since July 2000; he saw her on April 22, 2004, and recommended surgery

32

for her carpal tunnel syndrome; and he saw her on May 13, 2004, to remove the sutures and commented that plaintiff was doing very well.  There was no mention in any of those records about fibromyalgia.

**5.  Consistency of the opinion with the record as a whole.**
Dr. Essmyer's opinion that plaintiff is disabled is not consistent with his own medical records or the records of other doctors.  First I note that Dr. Essmyer approved plaintiff's school bus physical and wrote, "I see no reason why she shouldn't be able to drive the bus."  In addition, he noted on March 13, 2003, that plaintiff walks without difficulty.  On June 2, 2003, he wrote that plaintiff's medication was controlling her pain.

Dr. Essmyer noted on June 30, 2003, that he would continue to prescribe narcotics since a surgical option was not available to plaintiff.  However, a surgical option was not available because plaintiff refused to stop smoking, which Dr. Essmyer noted.[8]

On April 2, 2003, Dr. Essmyer noted that he would continue to prescribe plaintiff's medications "as long as she continues to be very careful with her narcotics usage."  On the very next visit, less than a month later, he wrote, "Patient continues to

_____

[8]When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

run out of medication early and manipulate her own medications."
Despite that, the records show that he prescribed narcotic
medications 25 more times over the next 14 1/2 months. On
January 3, 2003, Dr. Essmyer prescribed 120 Tylox pills and told
plaintiff it was a two-month supply. She was back 21 days later
and he gave her another 120 Tylox pills. She came back 17 days
later and he gave her a prescription for yet another 120 Tylox
pills. It appears that either Dr. Essmyer was not carefully
watching the amount of narcotics he was prescribing, or that
plaintiff routinely convinced him that she needed more, and more,
and more narcotics.

In his letter finding that plaintiff was disabled, Dr.
Essmyer noted that plaintiff had had the maximum number of lumbar
epidural steroid injections that she could have in a year;
however, the medical records show that her last injection was
more than two years earlier, and that is also consistent with
plaintiff's testimony at the hearing. Dr. Essmyer wrote, "I do
give her osteopathic manipulative therapy treatments"; however,
his records do not reflect any osteopathic manipulative therapy
treatments and plaintiff testified at the administrative hearing
that other than drugs, physical therapy, and steroid injections,
she has had "no other treatment" for her back.

On July 24, 2003, Dr. Brandenberg, a neurosurgeon, performed
a physical exam and found that plaintiff's gait was normal, she

34

was able to rise from a chair to standing position without difficulty, straight leg raising was negative, and strength in her lower extremities was 5/5. He recommended a CT myelogram which was scheduled for August 12, 2003. On August 11, plaintiff canceled the CT myelogram and was not interested in rescheduling. On August 28, Dr. Essmyer noted that the CT myelogram had never been done and indicated he would set that up. However, the records indicate that plaintiff never went through with the recommended CT myelogram. Instead, Dr. Essmyer continued to prescribe narcotics.

On April 1, 2004, Dr. Browning, an orthopedist, noted that plaintiff had no new health changes since July 2000.

On June 1, 2004, Dr. Jackson, a rheumatologist, recommended that plaintiff walk at least 30 minutes each day.

Dr. Elliot, a non-examining physician, found that plaintiff could stand or walk at least two hours per day and sit for six hours per day. She based these findings mainly on Dr. Essmyer's medical records, specifically, his qualifying plaintiff to drive a school bus under DOT rules which led her to believe that plaintiff tolerates her medications and is able to function. She also noted that plaintiff was advised to have a CT myelogram but never did, and that she has been told surgery is out of the question if she continues to smoke, yet she does continue to smoke. She also noted that plaintiff's medical records showed no

significant change in physical exam or symptoms since 2002 when she was gainfully employed.

Even plaintiff's own statements contradict Dr. Essmyer's opinion that plaintiff cannot perform any work. In her Disability Report, she was asked how her condition limits her ability to work, and she wrote, "I can no longer work a 10 hour shift." In her Pain Questionnaire, she reported that her pain is bearable after taking pain pills. In case action notes, plaintiff said she was able to sit for two hours at a time. She told Dr. Brandenberg that her pain increases with standing and lifting. She did not complain of pain while sitting. During the administrative hearing, she testified that she could sit for two hours at a time. When asked whether she could perform a job with a sit/stand option, plaintiff said she would need to sit for a half hour then stand for a half hour.

**6. Specialization of the doctor.** Dr. Essmyer is a family practitioner.

Based on all of the above, I find that the ALJ did not err in failing to give controlling weight to the opinion of Dr. Essmyer. I note also that the only opinion provided by Dr. Essmyer was his letter stating that plaintiff is unable to hold a full-time job due to her chronic pain.[9]  A physician's conclusory

---

[9]Dr. Essmyer never limited any of plaintiff's activities, and he never provided an opinion as to her functional limitations.

36

statement of disability without supporting evidence does not overcome substantial medical evidence supporting the Commissioner's decision. Loving v. Dept. of Health and Human Services, 16 F.3d 967, 971 (8th Cir. 1994); Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992). Finally, an opinion by a doctor that a claimant cannot work is not a medical opinion. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination"); Baker v. Barnhart, 457 F.3d 882, 894 (8th Cir. 2006) (A physician's opinion regarding a claimant's ability to find work within a particular classification is not a "medical opinion"); Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995) (An opinion as to whether a claimant can find work or be gainfully employed is outside the province of medical doctors).

Therefore, based on all of the above, I find that the ALJ did not err in discrediting the opinion of Dr. Essmyer that plaintiff cannot work full time, and plaintiff's motion for summary judgment on this basis will be denied.

## VII. FAIR AND THOROUGH HEARING

Plaintiff next argues that she should not be responsible for the actions of her attorney in:

> apparently failing to provide up to 23 months of medical
> records from and after July of 2004. Claimant would argue

that she has continued to aggressively seek medical care
from and after 2004 but because she had an inexperienced
attorney that does not practice in this area of the law, she
has been penalized for his failure to include up to date
medical treatment records as a part of her file.

(plaintiff's brief at p. 9).

While an ALJ has the duty to develop the record fully and
fairly, he is not required to function as substitute counsel and
only needs to develop a reasonably complete record. Cox v.
Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Clark v. Shalala, 28
F.3d 828, 830-31 (8th Cir. 1994); Onstad v. Shalala, 999 F.2d
1232, 1234 (8th Cir. 1993). In this case, plaintiff was
represented by counsel at the administrative hearing. While her
attorney indicated disability claims were not his usual practice,
he indicated he had advised plaintiff of his inexperience prior
to the hearing. Plaintiff signed a fee agreement with her
attorney in January 2005, a year and a half before the hearing,
indicating that plaintiff and her attorney had adequate time to
review the record and prepare for the administrative hearing. In
addition, various Social Security notices sent to plaintiff
informed her that she could submit additional evidence to the
ALJ.

It is the plaintiff's responsibility to provide medical
evidence to show that she is disabled. 20 C.F.R. §§ 404.704 and
404.1512; Cox v. Barnhart, 471 F.3d at 907. While the Agency has
the duty to make every reasonable effort to help a claimant get

38

medical reports, the claimant has the duty to bring to the
Agency's attention all evidence that she is disabled.  20 C.F.R.
§§ 404.1512(d) and 416.912(d).

The ALJ asked at the hearing whether plaintiff had any
additional evidence to submit, and the answer was "no."
Plaintiff had the opportunity to submit additional evidence to
the Appeals Council with her request for review, but she did not.
20 C.F.R. §§ 404.976(b)(1) and 416.1476(b)(1).

Finally, reversal due to failure to develop the record is
only warranted when such failure is unfair or prejudicial.
Onstad v. Shalala, 999 F.2d at 1234.  In this case plaintiff has
failed to explain the significance of the records she alleges
were missing, nor has she alleged that the records would be
dispositive of her claim of disability.  Shannon v. Chater, 54
F.3d 484, 488 (8th Cir. 1995) (fact that claimant's counsel did
not obtain or try to obtain the records suggests they only had
minor importance).

Plaintiff originally alleged that she became disabled on
April 1, 2002.  Her alleged onset date was amended to January 1,
2004, based on her substantial earnings prior to that time.  From
plaintiff's original alleged onset date to her amended alleged
onset date, her medical treatment consisted almost entirely of
obtaining narcotics.  From her amended alleged onset date to the

39

end of the medical records provided, her medical treatment consisted almost entirely of obtaining narcotics:

| 07/18/2002 | Prescription for Tylox (**narcotic**) |
| 07/24/2002 | Prescription for Tylox (**narcotic**) |
| 07/30/2002 | Lumbar Epidural Steroid Injection |
| 08/09/2002 | Prescription for Tylox (**narcotic**) (30 pills) |
| 08/27/2002 | Prescription for Tylox (**narcotic**) (90 pills) and Soma (muscle relaxer) |
| 09/13/2002 | Prescription for Tylox (**narcotic**) (30 pills) |
| 09/21/2002 | Prescription for Tylox (**narcotic**) (120 pills) |
| 09/25/2002 | Continue narcotic pain control and anti-inflammatory |
| 11/08/2002 | Prescription for Tylox (**narcotic**) (120 pills) |
| 11/27/2002 | Prescription for Tylox (**narcotic**) (60 pills) |
| 01/03/2003 | Dr. Essmyer learned that plaintiff failed to tell him the orthopedist recommended Pain Clinic. Prescription for Tylox (**narcotic**) (120 pills with note that this should be a two-month supply) |
| 01/20/2003 | MRI of lumbar spine |
| 01/24/2003 | Prescription for Tylox (**narcotic**) (120 pills, despite having noted 21 days earlier that the last prescription should last two months) |
| 02/03/2003 | Dr. Brandenberg recommended physical therapy, discussed the importance of smoking cessation "first for general back health and secondly for the fact that if she requires any type of surgery in the future that might require fusion that she would need to be smoke free before that could become an option." |
| 02/10/2003 | Prescription for Tylox (**narcotic**) (120 pills)[10] |

[10]Dr. Essmyer prescribed a total of 240 pills during the time that he originally said 120 pills must last.

40

| | |
|---|---|
| 02/18/2003 | Lumbar epidural steroid injection |
| 02/27/2003 | Prescription for OxyContin **(narcotic)** (60 pills) |
| 03/06/2003 | Increased OxyContin from twice a day to three times per day. |
| 03/10/2003 | Prescription for OxyContin **(narcotic)** (90 pills) |
| 03/13/2003 | Prescription for Norco **(narcotic)** (80 pills) |
| 03/14/2003 | Cancelled an appointment with Dr. Brandenberg "again" and did not want to reschedule. |
| 04/02/2003 | Dr. Essmyer doubled plaintiff's dose of OxyContin from 20 mg three times per day to 40 mg three times per day and wrote, "We will continue to provide supportive care as long as she continues to be very careful with her narcotics usage." |
| 04/30/2003 | Dr. Essmyer wrote, "Patient continues to run out of medication early and manipulate her own medications." Prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic)** (60 pills) |
| 06/02/2003 | Prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic)** (60 pills) |
| 06/30/2003 | Dr. Essmyer wrote, "She is becoming more dependent on narcotics". Prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic)** (60 pills). |
| 07/24/2003 | Dr. Brandenberg recommended a CT myelogram to see if there was any evidence of root compression which could possibly be relieved by surgery. Plaintiff asked him about disability, he said he could not help her with that. |
| 07/30/2003 | Prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic)** (60 pills) |
| 08/11/2003 | Plaintiff canceled the CT myelogram and was not interested in rescheduling. |
| 08/28/2003 | Dr. Essmyer said he would set up the CT myelogram that was recommended by Dr. Brandenberg. Plaintiff never had the CT myelogram. |

Case 5:07-cv-06002-REL   Document 29   Filed 08/11/08   Page 41 of 44

| | |
|---|---|
| 09/27/2003 | Prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic)** (60 pills) |
| 10/01/2003 | Dr. Essmyer passed plaintiff's school bus physical. |
| 10/27/2003 | Prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic)** 60 pills |
| 12/22/2003 | Prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic)** (60 pills) |
| 01/01/2004 | Plaintiff's alleged onset date |
| 01/23/2004 | Talked to Dr. Essmyer about trying to get disability; prescription for OxyContin **(narcotic)** (90 pills) and Norco **(narcotic**) (60 pills) |
| 02/23/2004 | Prescription for OxyContin **(narcotic)** |
| 03/22/2004 | Prescription for OxyContin **(narcotic**) (60 pills) and Norco **(narcotic)** (60 pills) |
| 03/29/2004 | Drained and injected olecrano bursitis |
| 04/01/2004 | Dr. Browning noted plaintiff was trying to get disability due to her back, found symptoms of carpal tunnel syndrom. |
| 04/22/2004 | Prescription for OxyContin **(narcotic)** (60 pills) and Norco **(narcotic)** (60 pills) |
| 04/22/2004 | Recheck of right elbow |
| 04/30/2004 | Sutures removed (unrelated to impairment) |
| 05/06/2004 | Recheck of right hand |
| 05/13/2004 | Recheck of right hand |
| 05/19/2004 | Prescription for OxyContin **(narcotic)** (60 pills) and Norco **(narcotic)** (30 pills) |
| 06/01/2004 | Rheumatologist recommended plaintiff walk at least 30 minutes every day |
| 06/15/2004 | Prescription for OxyContin **(narcotic)** (60 pills) and Norco **(narcotic)** (60 pills) and Flexeril (muscle relaxer) |
| 06/22/2004 | Depo Medrol and Decadron injection (steroid) |

42

| 06/29/2004 | Evaluation of right elbow |
|---|---|
| 07/12/2004 | Prescription for OxyContin **(narcotic)** (60 pills) and Narco **(narcotic)** (60 pills) |
| 02/21/2005 | MRI of lumbar spine |
| 06/12/2006 | Administrative hearing |

The above summary makes clear that plaintiff was interested in one thing: continuing her narcotics therapy. Plaintiff canceled appointments with Dr. Brandenberg, the neurosurgeon who would not help her with disability and who told her she needed to stop smoking. She failed to follow up with the CT myelogram, because a positive result would mean surgery, and in order to have surgery plaintiff would have to stop smoking. Plaintiff was told by a specialist to go to the Pain Clinic and failed to do that, even keeping that recommendation from her primary care physician.

Plaintiff's allegations are not credible: For example, plaintiff testified that during 2003 she missed 13 weeks of work because she could not walk, just had to crawl, and no doctor could tell her why she could not walk. There is not one allegation in any medical record during 2003 or any other year that plaintiff had to crawl in lieu of walking. Furthermore, there is no 13-week period during 2003 when plaintiff failed to show up at a doctor's office, and no doctor noted in a medical record that plaintiff crawled into the office instead of walking. Plaintiff's (1) lack of credibility, (2) failure to go to the

43

Pain Clinic as directed, (3) failure to tell Dr. Essmyer she was told to go to the Pain Clinic, (3) history of canceling appointments with her neurosurgeon who would not help her with disability and who told her to stop smoking, (4) failure to get a CT myelogram as directed by both Dr. Brandenberg and Dr. Essmyer, (5) history of using more narcotic drugs than prescribed, (6) history of "manipulating" her own medications, and (7) failure to stop smoking despite being told she needed to for general back health and any possible surgery are all indicative of narcotics-seeking behavior. This coupled with plaintiff's failure to identify what addition medical records were missing suggests that any missing medical records will likely reflect nothing more than additional narcotics prescriptions.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 11, 2008

44